

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALLSTATE INSURANCE CO., | |
| Plaintiff/Counter-Defendant | No. 01 C 1093 |
| v. | The Honorable William J. Hibbler |
| EMPLOYERS REINSURANCE CORP., | |
| Defendant/Counter-Plaintiff. | |

## MEMORANDUM OPINION AND ORDER

Employers Reinsurance Corporation (ERC) reinsured Allstate Insurance Company's automobile insurance line from 1934 until 1978 under a number of different agreements. In 1999, Allstate reported to ERC 88 claims that arose under a Treaty agreement that had been in effect from 1972 to 1978. ERC denied coverage on all 88 claims, which prompted Allstate to file this suit. ERC filed a counter claim in which it seeks a declaratory judgment that Allstate violated the Treaty Agreement by untimely submitting these 88 claims and that it is not obligated to pay Allstate any amount for any of the 88 claims. The parties have filed cross-motions for summary judgment.

### I. Factual Background

As is frequently the case in contract disputes, the facts of this case are largely not in dispute. ERC and Allstate began a business relationship in 1934, when ERC agreed to provide reinsurance coverage for the automobile insurance that Allstate provided to its customers. Among other things, ERC reinsured Allstate on its Personal Injury Protection (PIP) coverage that provided, in various states with no-fault insurance laws, unlimited, lifetime medical payments to persons injured in automobile accidents. In 1971, the parties rewrote a 1959 reinsurance treaty, and entered into a

1

Liability Excess Reinsurance Agreement (the Treaty). Under the Treaty, initially, Allstate was responsible for the first $250,000 of loss on each PIP claim. In 1976, the retention increased to the first $350,000 of each claim. But above the retention, ERC was obligated to indemnify Allstate for its payments on PIP claims in the amount of 100% for the first several hundred-thousand dollars and 50% of Allstate's payments thereafter until Allstate's total payment on the claim reached $5,000,000. Allstate terminated the Treaty effective January 1, 1978, but ERC remained obligated on PIP claims that arose on or after January 1, 1972 and before January 1, 1978.

The dispute between the parties turns upon Article XII of the Treaty. Article XII states in relevant part:

> CLAIMS. The REINSURED [Allstate] agrees that it will investigate and will settle or defend all claims arising under policies with respect to which reinsurance is afforded by this agreement, and that it will give prompt notice to the CORPORATION [ERC] of any event or development which, in the judgment of the REINSURED, might result in a claim upon the CORPORATION hereunder, and will forward promptly to the CORPORATION copies of such pleadings and reports of investigation as may be requested by the CORPORATION.

Through 1998, the parties appeared to have little trouble working under the Treaty. In 1999, Allstate conducted a review of its open PIP claims in connection with its process improvement project. Allstate discovered 88 open claims that were covered under the Treaty, but had not yet been submitted to ERC. Allstate then submitted to ERC a list of these 88 claims that contained basic information regarding each claim. Allstate noted that the "vast majority of these claims have not reached [their] retention level," but that because of the "age and nature" of the claims it believed it would be helpful to notify ERC that they remained open. Allstate offered to provide "any additional information [ERC might] require on [those] claims."

2

ERC then investigated its records and the documentation submitted by Allstate on each claim. ERC noted that seven of the 88 claims already exceeded the Treaty retention and that Allstate had billed it $1,622,000.13 for these seven claims. ERC also noted that another 22 claims carried reserves greater than 50% of Allstate's retention. The remaining 59 claims carried reserves less than 50% of Allstate's retention. In November 1999, ERC sent Allstate a letter denying the 7 claims that had already exceeded retention and the 22 claims that carried reserves greater than 50% of Allstate's retention, citing Article XII of the Treaty. ERC concluded the letter by commenting that "[a]ll claims for which the reserve exceeds one half the applicable retention should have been promptly reported to ERC."

Allstate responded to ERC's letter, noting its disappointment that ERC had denied the claims, and commenting that Article XII of the Treaty contains no express provision requiring Allstate to provide notice to ERC when the reserves exceed 50% of retention. ERC responded that its intention in using the "'half of retention' marker" was "not to assert that [it] was a term of the Treaty, but merely to illustrate that the reporting of the claims for which Allstate is now submitting billings is particularly dilatory." Allstate countered by suggesting that the Treaty "does not require Allstate to comply with ERC's standards for when 'it might expect a reinsured to report a claim' . . ., [but rather] specifically empowers Allstate with discretion to determine when a claim might impact the [Treaty.]"

The parties met in 2000 to attempt to resolve the dispute, but were unable to do so. Instead, in February 2001, Allstate filed this suit. Allstate seeks a coverage declaration for 29 of the 88 claims

and reimbursement for 8 of the 88 claims.[1] ERC has filed a counterclaim seeking a declaration that it has no obligation to pay Allstate any sums for any of the 88 claims.

## II. Standard of Review

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986). For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

In evaluating a summary judgment motion, the court must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When both parties have moved for summary judgment, the court therefore construes the facts in the light most favorable to the non-moving party and both parties must demonstrate that no genuine issue of material fact exists. *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir.2003). If issues of fact do exist, neither party is entitled to summary judgment.

## III. Choice of Law

The Treaty contains no choice-of-law clause, and only ERC addresses which law governs this dispute. In diversity actions, federal courts follow the forum state's choice-of-law rules. *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). Illinois has adopted the "most significant

---

[1] Since the lawsuit was filed, one of the 22 claims that exceeded 50% of the retention has now exceeded the retention.

4

contacts" test in deciding choice-of-law disputes with respect to contractual issues. *Id.* (collecting cases). Under this test, "'the contacts relevant to the choice-of-law decision include the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicil[e], residen[ce], place of incorporation, and business of the parties. " *Id.* (quoting *Wildey v. Springs*, 47 F.3d 1475, 83 (7th Cir.1995) (internal quotations omitted)).

The undisputed facts demonstrate that the Treaty was negotiated and executed in Illinois, that Allstate is an Illinois Corporation, Allstate sent ERC the Notices of Claim for the 88 claims at issue from Illinois, and that ERC is incorporated in Missouri. Given these undisputed facts, the Court concludes that Illinois substantive law applies.

## IV. Analysis[2]

Under Illinois law, an insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance polices. *Dempsey v. Nat'l Life & Accident Ins. Co.*, 404 Ill. 423, 426, 88 N.E. 2d 874 (1949); *Baltica Ins. Co. v. Carr*, 330 Ill. 608, 162 N.E. 178 (1928); *Employers Reinsurance Corp. v. E. Miller Ins. Agency, Inc.*, 332 Ill. App. 3d 326, 338, 773 N.E.2d 707, 716 (2002) (quoting *Waste Management, Inc. v. Int'l Surplus Lines Ins. Co.*, 144 Ill. 2d 178, 191-92, 579 N.E. 2d 322 (1991)); *see also Universal Reinsurance Corp. v. Allstate Ins. Co.*, 16 F.3d 125 (7th Cir. 1994) (applying principles of contract interpretation to arbitration provision of reinsurance agreement).[3] Thus, the primary objective of a

---

[2] The Court recognizes that ERC's decision to cite *Cas. Ins. Co. v. Const. Reinsurance Co.*, No. 91 L 14732 (Cir. Ct. of Cook Cty, Law Div., Jan. 22, 1996) violates Cir. R. 53(e). The Court has disregarded all portions of ERC's brief concerning this case and Allstate's Motion to Strike (Doc. # 95) is GRANTED.

[3] Technically, a reinsurance contract is not one of insurance, but one of indemnity. *Baltica Ins. Co.*, 330 Ill. at 613, 162 N.E. at 180. Nonetheless, Illinois courts have held that the

5

court in a contract dispute is to give effect to the intention of the parties as expressed in the contract. *American States Ins. Co. v. Koloms*, 177 Ill. 2d 473, 479, 687 N.E. 2d 72 (1997). Where the language of the parties' agreement is clear and unambiguous, the court must enforce the agreement according to its plain meaning. *Menke v. Country Mutual Ins. Co*, 78 Ill. 2d 420, 423, 401 N.E.2d 539 (1980); *Klemp v. Hergott Group, Inc.*, 267 Ill. App. 3d 574, 580-81, 641 N.E. 2d 957, 962 (1994). It is not the province of the court to rewrite the parties' agreement. *Klemp*, 267 Ill. App. 3d at 581, 641 N.E.2d at 962; *Universal Reinsurance Corp.*, 16 F.3d at 129. And there is "a strong presumption against provision that easily could have been included in the contract but were not." *Klemp*, 267 Ill. App. 3d at 581, 641 N.E.2d at 962.

This dispute turns upon the language in the Treaty that requires Allstate to "give prompt notice to [ERC] of any event or development which, in the judgment of [Allstate], might result in a claim upon [ERC.]" ERC argues that Allstate's bulk-reporting of 88 open, PIP claims more than 20 years after the accidents occurred violated this provision of the Treaty. Allstate argues that its submission of the 88 claims was timely, that ERC was not prejudiced by any untimely submission even if Allstate's submission of the claims were not timely, and that ERC should be estopped from denying untimely claims because it previously had accepted similar claims.

Several Illinois cases discuss the interpretation of notice provisions. *Hartford Accident & Indem. Co. v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 231 Ill. App. 3d 143, 595 N.E. 2d 1311 (1992), *Atlanta Int'l Ins. Co. v. Checker Taxi Co.*, 214 Ill. App. 3d 440, 574 N.E.2d 22 (1991); *Sisters of Divine Providence v. Interstate Fire & Cas. Co.*, 117 Ill. App. 3d 158, 453 N.E.2d 36

---

rules of contract interpretation apply. *See, e.g., E. Miller Ins. Agency, Inc.*, 332 Ill. App. 3d at 338, 773 N.E.2d at 716.

(1983); *Brownlee v. Western Chain Co.*, 74 Ill. App. 3d 804, 393 N.E.2d 515 (1979). These cases hold generally that where a notice provision grants the insured discretion under the provision, "the duty to give notice to an excess insurer does not ripen until the insured *reasonably believes it likely* that a claim under the excess insurance policy may be made." *Hartford Accident*, 231 Ill. App. 3d at 150, 595 N.E.2d at 1315 (emphasis in original); *see also Atlanta Int'l Ins. Co.*, 214 Ill. App. 3d at 446, 574 N.E.2d at 25. Thus the question for the Court, which is a question of law when the facts are undisputed, is whether the insured acted unreasonably under the circumstances when determining when to report the claim to the excess insurer. *Hartford Accident*, 231 Ill. App. 3d at 150-51, 595 N.E.2d at 1316; *Atlanta Int'l Ins. Co.*, 214 Ill. App. 3d at 446, 574 N.E.2d at 26; *Sisters of Divine Providence*, 117 Ill. App. 3d at 162, 453 N.E.2d at 39.

Here, *Atlanta Int'l* and *Hartford Accident* are most instructive. In *Atlanta Int'l*, the Court noted that the simple facts that a young mother was killed in the accident and that a wrongful death complaint had been filed did not require the primary insurer to notify the excess insurer that its policy might be implicated. *Atlanta Int'l Ins. Co.*, 214 Ill. App. 3d at 444, 574 N.E.2d at 25. The Court noted that had the excess insurer desired immediate, automatic notice of all accidents or accidents in which particular injuries had occurred, it could have inserted language to that effect in the contract. *Id.* Even though the insured gave notice to the excess carrier more than two years after the occurrence, the Court held that it was not appropriate "to allow an excess carrier to escape liability after granting its insured discretion in deciding the point at which liability under the policy becomes 'likely,' [and] [e]xcess insurance carriers are free to specify in their notice provisions any triggering events they deem desirable." *Id.* at 446, 574 N.E.2d at 26.

In *Hartford Accident*, the policy provided coverage for medical malpractice claims in excess of $1 million and required the primary insurer to give the excess insurer notice of "an occurrence . . . likely to involve indemnity under [the] policy." *Hartford Ins.*, 231 Ill. App. 3d at 145, 595 N.E.2d at 1312. The alleged malpractice had occurred in 1976, a medical malpractice complaint was filed in 1984, and the primary insurer received a $10 million dollar settlement demand in 1985. The primary insurer, however, did not notify the excess insurer until May 1986. *Id.* at 146, 595 N.E.2d at 1313. The Court concluded that despite the filing of the complaint and the settlement demand, it was reasonable for it to wait until *after* it had reviewed the case, deposed the doctor, and determined that liability in excess of $1 million was *likely* as opposed to merely possible. *Id.* at 151-52, 595 N.E.2d at 1316-1317.

ERC makes much of the fact that Allstate reported the 88 claims more than 20 years after they arose. But Allstate was not required by the Treaty to report the claims when they arose. Instead, the Treaty required Allstate to report the claims after "any event or development, which in the judgment of [Allstate], might result in a claim upon [ERC]." Thus, the triggering point for Allstate's duty to provide notice is not the date at which the claims arose, but the date at which Allstate believed that the claim might result in a claim upon ERC. In other words, the Treaty gives Allstate some discretion to determine when a claim might result upon ERC and does not require it to report claims immediately upon their occurrence. *Cf. Imperial Casual & Indemnity Co. v. Chicago Housing Authority*, 987 F.2d 459, 461-62 (7th Cir. 1993) (discussing similar language granting insured discretion); *Hartford Accident*, 231 Ill. App. 3d at 152-53, 595 N.E.2d at 1317 (discussing exercise of discretion).

8

ERC next suggests that Allstate's "sloppy," "bulk reporting" of 88 claims 21-27 years after the claims arose violates the prompt-notice requirement on its face. But the Treaty makes no mention of the manner in which Allstate must provide notice. In fact, the Treaty does not even specify that the notice must be written, let alone that it contain sufficient information for ERC to determine the basis of the claim. ERC's implicit argument is that Allstate's bulk-reporting violated Article XII because its notice of claims contained insufficient information. The Treaty, however, imposes no duty upon Allstate to provide detailed information when it reports claims to ERC that might exceed the Treaty retention. To the contrary, the Treaty contains an express provision that requires Allstate to "forward promptly to [ERC] copies of such pleadings and reports of investigation *as may be requested by [ERC]*." (emphasis added). In other words, the Treaty imposes upon ERC the obligation to seek additional information if it believes the information provided by Allstate in its notice is insufficient for it to conduct an investigation of the claim. The Court will not read into the Treaty language that the parties easily could have included, but chose not to, and it certainly will not alter the plain language of the agreement. *Klemp*, 267 Ill. App. 3d at 580-81, 641 N.E. 2d at 962; *Hartford Accident*, 231 Ill. App. 3d at 152, 595 N.E.2d at 1317; *Atlanta Int'l Ins. Co.*, 214 Ill. App. 3d at 446, 574 N.E.2d at 26.

Instead, the Court will evaluate whether Allstate complied with the Article XII of the treaty by examining the claims organized into three categories: 1) claims which exceeded retention at the time Allstate gave notice to ERC; 2) claims that had not reached 50% of retention at the time Allstate gave notice to ERC; and 3) claims that had not yet reached retention, but carried reserves greater than 50% of retention, at the time Allstate gave notice of these claims to ERC. The first two categories of claims can be resolved easily.

9

ERC argues that Allstate's failure to report 7 claims until after those claims exceeded retention violates the "prompt notice" requirement. And there can be no question that Allstate's failure to report 7 claims until after they exceeded retention violated the requirement that Allstate provide ERC with prompt notice. As ERC notes, the mere fact that Allstate is given discretion to determine which events *might* result in a claim against ERC, does not mean that Allstate has unfettered discretion. *Sisters of Divine Providence*, 117 Ill. App. 3d at 161-62, 453 N.E. 2d at 38-39 (failure to notify excess insurer until after plaintiff gained knowledge that excess policy would likely be invoked violated notice requirement); *Brownlee*, 74 Ill. App. 3d at 811-12, 393 N.E.2d at 484 (if insured had actual knowledge that accident would give rise to a claim under excess insurance policy, notice requirement would require it to give prompt notice). Indeed, to hold otherwise, would be to read the notice requirement out of the contract. Allstate suggests that many of the seven claims exceeded the retention only recently (three only months before they were reported to ERC). The Treaty, however, requires Allstate to give prompt notice to ERC of any claim after any event or development that *might* result in a claim upon ERC, not after any event or development that *has* resulted in a claim upon ERC. *See, e.g., Zenith Ins. Co. v. Employers Ins. of Wasau*, 141 F.3d 300, 305-07 (1998) (applying Wisconsin law, but interpreting a similar notice provision).

In this regard, the facts of the Kelly claim are telling. Between 1974 and 1995, Allstate paid only $84,700 on this claim — and thus no event or development suggested that Allstate's liability on the claim might exceed the $250,000 Treaty retention. But in 1996, the claimant began to lose renal function and in 1997 the claimant underwent a kidney transplant, resulting in medical costs that caused Allstate's liability under the claim to exceed the Treaty retention. But Allstate waited nearly two years *after* the amount paid on the claim exceeded the retention to give ERC notice of this claim.

10

For twenty-one years, Allstate had no reason to suspect its liability on the Kelly claim would exceed the Treaty retention—and thus it had no reason to report it to ERC. But when a major change in the claimant's medical needs arose, followed by a corresponding spike in payments on the claim, it was apparent that a claim upon ERC *might* result. And Allstate waited more than 3 years before reporting this development to ERC.[4] The Court holds that Allstate failed to comply with Article XII of the Treaty when it reported the Reed, Toal, Shields, Robinson, Kelly, Tanis, and Barcos Claims until after its payments on those claims exceeded the Treaty retention.

ERC's argument that Allstate's decision to report 59 claims that had not reached 50% of the Treaty retention also violated Article XII is wholly without merit. ERC again focuses on the fact that Allstate reported these claims 21-27 years after the claims arose. But as noted earlier, the Treaty does not require Allstate to give notice on *all* PIP claims. It requires Allstate to give notice whenever any event or development might result in a claim upon ERC. The fact that these claims have been open for 26-32 years and Allstate's reserves on the claims still has yet to reach even 50% of the Treaty retention suggests that no event or development that might result in a claim upon ERC has even occurred. If anything, Allstate has done more than what is required of it under the Treaty.

ERC also argues that each of these 59 claims involves a serious injury where unexpected spikes in medical costs could occur. While this may be true, the Treaty simply does not impose upon Allstate the obligation to report any PIP claim where a serious injury occurs, and had that been the

---

[4] The facts of the other 6 claims that Allstate failed to report until after its liability on the claim exceeded the Treaty retention vary little. In fact, in most instances, Allstate paid very little on the claim for an umber of years and then some major change in medical needs occurred, after which the amount paid under the claim spiked. In one instance, the Barcos claim, Allstate admits that it simply failed to pay attention to the claim until it discovered in 1999 that its payments on that claim exceeded the Treaty retention. In any event, in each instance, Allstate failed to report the claim until after it exceeded the Treaty retention.

11

parties' intention, they could have easily placed such a clause in their agreement. *Hartford Accident*, 231 Ill. App. 3d at 152, 595 N.E.2d at 1317. The Court will not add terms to the parties' agreement and it holds that Allstate's reporting of the 59 claims where its payments on the claim had not reached 50% of the Treaty retention did not violate Article XII of the Treaty.

This leaves only those 22 claims where Allstate's reserves on the claim exceeded 50% of the Treaty retention at the time Allstate gave notice of the claims to ERC. ERC suggests that Allstate's failure to report these 22 claims until after they exceeded 50% of retention also violated the Treaty's requirement. In support ERC points to its own "Guide For Reporting Reinsurance Losses," which suggests that a reinsured company should provide notice when a claim involves serious injuries (enumerated in the Guide) or when the reinsured's company reserves exceeds 50% of the policy retention. (Def./Counter-Pl. 56.1(a)(3) Statement Ex. 38). But ERC's Guide was never made part of the Treaty. Similarly ERC points to Allstate's Claim Manual, which comments that "[i]t is the examiner's responsibility to keep reinsurers advised of all claims which they feel represent a potential or actual exposure to the company. In every instance where the examiner has some concerns about a loss, reinsurers are to be notified." (Def./Counter-Pl. 56.1(a)(3) Statement Ex. 41). But, like ERC's Guide, Allstate's Claim Manual was not made part of the Treaty. ERC suggests that the "'half of retention' marker [is] merely a guideline to indicate when [it] would expect a reinsured to report a claim," citing a letter written by its Claims Counsel to Allstate. But the Treaty does not suggest that Allstate's reporting of claims must meet ERC's expectations. To the contrary, it gives Allstate the discretion to determine when claims should be reported. ERC could easily have included language in the notice provision that required Allstate to give noticed whenever the "half of retention marker" was reached or when any claim involving a certain enumerated injuries arose.

12

It did not. And the Court will not read such a requirement into the Treaty. *See Hartford Accident*, 231 Ill. App. 3d at 152, 595 N.E.2d at 1317 (refusing to read language into the contract).

Instead, the Court finds that the undisputed facts show that 21 of the 22 cases that exceeded 50% of the Treaty retention at the time when Allstate provided notice to ERC still have not reached the Treaty retention — more than 26 years after the accident occurrences and more than 5 years after Allstate gave notice to ERC. In some instances, Allstate had previously given notice to ERC regarding the claim but ERC had closed its file on the claim based on a belief that the claim would not reach the retention. In other instances, the claims may have involved significant one-time medical complications with nominal costs since. In other instances, the claims involved consistent amounts paid per year, but those amounts have been small and the total amount paid on the claims still have yet to near the Treaty retention. In each of these instances, Allstate's exercise of its discretion to report the claims in 1999 has been reasonable because there has yet to be an event or occurrence which caused Allstate, in a reasonable exercise of judgment, to believe that a claim under the Treaty might arise. And so, again, Allstate has done more than what is required of it under Article XII.[5]

The remaining claim, which exceeded 50% of the Treaty retention at the time of reporting, is the Coryell Claim. Through 1995, Allstate had paid only $159,236 on this claim. But in 1995, Mr. Coryell began to have back problems and began to undergo a series of back surgeries from 1995-1998. By September 1999, Allstate had paid $330,051 on the Coryell Claim, just under $20,000 below the retention. Given the fact that a dramatic increase in payments on the claim began in 1995

---

[5] Allstate notes that Gordon and Sherman have died and that it has closed the file on the Bertges claim with a $0 reserve for future payments. Those claims, Counts XIV, XXII, and IX, respectively, are DISMISSED as moot.

and continued for a period of three years, it was unreasonable for Allstate to delay reporting the claim to ERC for four years until 1999, when the claim had nearly reached the retention. *See Sisters of Divine Providence*, 117 Ill. App. 3d 158, 453 N.E.2d 36 (holding that where discovery was taken in 1977 and suggested that a resolution of the lawsuit might implicate the excess insurance policy, it was unreasonable for primary insurer to delay until 1980 to inform excess insurer).

Thus the Court concludes that the undisputed facts demonstrate that Allstate did not comply with the requirements of Article XII with respect to the Reed, Toal, Shields, Robinson, Kelly, Tanis, Barcos, and Coryell Claims. The Court further concludes that Allstate did comply with the requirements of Article XII with respect to the remaining claims, and it is entitled to summary judgment on all counts in its Third Amended Complaint and in ERC's Corrected First Amended Counterclaim with regard to those claims, but for those that are moot.

Allstate offers argues that ERC's summary judgment motion on the eight untimely claims should be denied because ERC has failed to show prejudice. The law in Illinois, however, is clear that a notice requirement, such as the one contained in the Treaty, is a condition precedent to coverage. *See Keehn v. Excess Ins. Co. of Am.*, 129 F.2d 503 (7th Cir. 1942); *E. Miller Ins. Agency, Inc.*, 332 Ill. App. 3d at 336-37, 773 N.E.2d at 715; *Northbrook Property & Casualty Ins. Co. v. Applied Sys., Inc.*, 313 Ill. App. 3d 457, 464, 729 N.E.2d 915 (2000); *INA Ins. Co. of Illinois v. City of Chicago*, 62 Ill. App. 3d 80, 83, 379 N.E.2d 34, 36 (1978). Consequently, "when the insured fails to comply with a prompt notice requirement, the insurer may deny liability, regardless of whether it has been prejudiced by the delay." *INA Ins. Co. of Ill.*, 62 Ill. App. 3d at 83, 379 N.E.2d at 36; *see also Highlands Ins. Co. v. Lewis Rail Serv. Co.*, 10 F.3d 1247, 1250 (7th Cir. 1993); *Imperial Casual & Indemnity Co. v. Chicago Housing Authority*, 987 F.2d 459, 463 (7th Cir. 1993); *Northbrook*

*Property & Cas. Ins. Co. v. Applied Systems, Inc.*, 313 Ill. App. 3d 457, 466, 729 N.E.2d 915, 922 (2000); *Del Grosso v. Casualty Ins. Co.*, 170 Ill. App. 3d 1098, 1101, 524 N.E.2d 1042, 1044 (1988) (overruled on other grounds by *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 186 Ill.2d 127, 152, 708 N.E.2d 1122, 1135 (1999)). In its summary judgment motion, Allstate vainly argues against the weight of the Illinois caselaw and suggests that ERC must demonstrate prejudice, citing cases from New York, Kansas, and the Third Circuit, none of which are relevant here.

Allstate's fallback position, which it puts forward in its response to ERC's motion for summary judgment, is that prejudice is "part of the equation in determining the reasonableness of the insured actions." The Seventh Circuit has interpreted Illinois law to distinguished between clauses that require insured parties to give "prompt" or "immediate" notice, as the clause in the Treaty here, and those which require insured parties to give notice "as soon as practicable," or "reasonable" notice. *See Highlands Ins. Co.*, 10 F.3d at 1249-50; *see also Transamerica Ins. Co. v. Interstate Pollution Control, Inc.*, No. 92 C 20247, 1995 WL 360460, *14 (N.D. Ill. Jun. 16, 1995). In cases where the contract between the parties requires only reasonable notice, prejudice is a factor to be considered in assessing the reasonableness of notice. *Highlands Ins. Co.*, 10 F.3d at 1249-50; *Northbrook Property*, 313 Ill. App. 3d at 466, 729 N.E.2d at 922. But at least one Illinois Appellate Court has considered prejudice when the policy required immediate notice. *See Atlanta Int'l*, 214 Ill. App. 3d at 444-445, 574 N.E.2d at 25-26. The prejudice in this case, however, is clear: with regard to the seven claims that Allstate failed to report until after the Treaty was implicated, ERC had no opportunity to build adequate reserves to pay these claims or plan for its financial obligations. Allstate never notified it of the claims until ERC was obligated to pay Allstate more than $1.5 million.

Allstate next argues that ERC should be estopped from asserting that Allstate's notice of these claims was untimely because ERC had, in the past, paid claims where Allstate had failed to report them to ERC until after the Treaty retention had been exceeded. "Estoppel refers to an abatement, raised by law, of rights and privileges of the insurer where it would be inequitable to permit their assertion; such relinquishment need not be voluntary, intended, or desired by the insurer, but it necessarily requires prejudicial reliance on the part of the insured." *Western Cas. & Sur. Co. v. Brochu*, 105 Ill.2d 486, 500, 475 N.E.2d 872, 879 (1985). In other words, Allstate needs to show that it relied upon ERC's acts or words in its decision to report untimely the 8 claims. Allstate, however, dooms its own estoppel argument because it admits that its decision to report the 8 (in fact all 88) claims was the result of its own inadvertence. In its brief in support of its motion for summary judgment, Allstate admits that it conducted an internal audit to determine whether it had any open PIP-claims that it had not reported and that it reported the 88 claims at issue here after conducting that audit. *See* Allstate's Mem. in Supp. of Sum. J. at 5-6. In a letter to ERC, Allstate admits that its failure to submit the claims to ERC earlier was "inadvertent[]." *See* ERC's 56.1(a)(3) Statement of Facts, Ex. 70. In other words, **Allstate has** admitted that *it was not even aware* of the open PIP claims that it had not submitted to ERC— not that it was aware that these claims were untimely but that it believed ERC would nonetheless accept them because ERC had accepted late claims in the past. It does not matter that ERC may have prompted Allstate's investigation. The undisputed fact remains that Allstate did not sit on the claims believing that ERC would accept late notice of them, but instead that Allstate was unaware of them. Allstate thus cannot show that it relied on any past words or conduct of ERC in its decision to submit the claims when it did and its estoppel argument fails.

## V. Conclusion

Because Gordon and Sherman have died and because Allstate has closed the file on the Bertges claim with a $0 reserve for future payments Counts XIV, XXII, and IX, respectively, are DISMISSED as moot. For the reasons stated herein, ERC's motion for summary judgment on the Reed, Toal, Shields, Robinson, Kelly, Tanis, Barcos, and Coryell Claims is GRANTED. ERC's motion for summary judgment on the remaining claims is DENIED. Allstate's motion for summary judgment on the Reed, Toal, Shields, Robinson, Kelly, Tanis, Barcos, and Coryell Claims is DENIED. And Allstate's motion for summary judgment on the remaining Counts in its Third Amended Complaint is GRANTED.

IT IS SO ORDERED.

3/18/05
Dated

The Honorable William J. Hibbler
United States District Court